UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
| Plaintiff(s), | ) |  |
| vs. | ) | Case No. 1:05CR 57 RWS |
| TONYA JOHNSON HYLES, | ) |  |
| Defendant(s). | ) |  |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The defendant filed four pretrial motions: Defendant's Motion to Suppress Evidence and Statements (Document #26); Motion for Specific Performance (Document #27); Motion to Disqualify the United States Attorney for the Eastern District of Missouri (Document #39); and Motion for Sanctions (Document #40).

At the first hearing on pretrial motions on October 27, 2005, the defendant withdrew her Motion for Sanctions (Tr. I[1]-3).

Concerning the Motion to Disqualify the United States Attorney, defendant's attorney acknowledged that the government's response to the motion correctly stated the law and that there would be only a very limited set of circumstances in which the motion would have any application. The motion was not pursued further and will be denied as moot.

---

[1] There were two hearings on the defendant's pretrial motions. The transcripts for those hearings will be designated as Tr. I for the hearing held on October 27, 2005, and Tr. II for the hearing held on November 4, 2005.

- 1 -

Concerning Defendant's Motion to Suppress Evidence and Statements, the defendant conceded that there was no longer any issue concerning whether the Miranda warnings were implicated as far as statements made by the defendant were concerned. However, the defendant continued to maintain that from the first meeting of the defendant with Officer Robert Lockett and through statements going forward from that first meeting, there was coercion, in that the defendant was told by Sergeant Robert Lockett that if she did not answer questions that the Division of Family Services would be contacted and the Division would take her children and put them in foster care.

Officer Lockett denied in his testimony that he made any such threat to Ms. Hyles. The defendant testified at the second hearing, but she did not state in her testimony that such a threat was made. The court finds that there was no evidence of such a threat. A potential witness who may have claimed that she had been threatened with having her children removed by Officer Lockett was subpoenaed by the defendant but refused to honor the subpoena and appear. The argument was made that this other witness may have been so coerced, but there was no testimony that she was so coerced. The defendant orally requested that on her non-appearance, the court attach the body of the potential witness. The court ruled that on the evidence before it, in view of the fact that the defendant had not testified that she had been threatened by Officer Lockett, such testimony of the other potential witness, if offered, would be irrelevant as to whether the defendant was threatened. The court denied the oral motion of the defendant to attach the body of the potential witness.

The court has found no evidence that such a threat was made to the defendant by Sergeant Lockett. The only testimony offered concerning such a possible threat was that of Sergeant Lockett, who repeatedly denied on the stand that he made any such threat.

The court will recommend that Defendant's Motion to Suppress Evidence and Statements be denied.

## Motion for Specific Performance

Following the two evidentiary hearings at which the defendant's Motion for Specific Performance (Document #27) was taken up, the parties filed memoranda. In her Memorandum (Document #54), the defendant presented a Summary of Issues Before the Court. The defendant states her position in the following terms:

> The Defendant asserts in her motion, and at the hearings on said motion, that there was an agreement entered into between herself and the government such that the indictment bearing case number 1:01CR00046ERW in the Eastern District of Missouri charging her with crimes arising out of the murder for hire committed by Tyrese Hyles and Amesheo Cannon would be dismissed in exchange for her statements to government agents prior to that agreement and with the expectation that she would continue to answer questions put to her by the government.

The defendant then summarizes what she feels is the government's position, that there was no agreement with the defendant to dispose of the charges then pending against her. The defendant continues:

> The first issue for the Court to decide is whether there was an agreement between the parties such that the charges against the Defendant would be dismissed. If the Court finds that there was such an agreement then the inquiry must move to what the terms of that agreement were and then whether there has been a breach of that agreement.

The court finds that there was an agreement contained in a proffer letter dated June 11, 2001. That letter is addressed by Assistant United States Attorney Michael A. Price to defendant's attorney, Matthew Hill. The letter is signed by Mr. Price and accepted in writing by the defendant and Mr. Hill, all on June 11, 2001. The letter requires that the defendant submit to an interview with law enforcement officers and Assistant United States Attorneys for the purpose of assessing the credibility and value of the assistance, evidence and possible testimony that she can provide. The

letter contains the proviso "Only if the Government determines that your client's information and ability to develop information is honest, reliable and worthwhile, will the Government enter into any agreement."

The letter contains the further provisions:

> For the purpose of allowing the prosecution to assess the credibility and value of the evidence and possible testimony that your client says she can provide, she must agree to first reveal everything she knows about the criminal activities of her, the co-defendants and others in the Eastern District of Missouri and elsewhere, and to do so completely, truthfully, and without guile. This interview and statement by your client will hereinafter be referred to as a "proffer."

> In the event that the information contained in your client's proffer is deemed by this office to be truthful, candid, and meritorious, this office will engage in negotiations involving specific concessions which will be made on behalf of the Government in exchange for your client's further cooperation.

The letter states that in exchange for the interview and proffer on June 11, 2001, the only promises made on behalf of the government in consideration for the proffer, except as otherwise provided in the proffer letter, are that any statement made by the defendant would not be used directly against her in the present or any subsequent prosecution and in connection with sentencing guidelines no self-incriminating information given by the client would be used directly or indirectly to enhance the offense level against Ms. Hyles, except as provided in the guidelines. This statement of use immunity provides further that the government may use any statements made or other information provided by Ms. Hyles to rebut evidence or arguments at sentencing materially different from any statements made or other information provided by Ms. Hyles. A further use immunity exception could occur if the defendant should become a witness at any future trial and offer testimony materially different from any statements made or other information provided. Then, in that event, the attorney for the government could cross-examine Ms. Hyles concerning any statements made or other information provided.

The letter contains a warning:

> Further, if your client knowingly provides untruthful information or if she knowingly withholds the full truth from Government agents and/or Assistant United States Attorneys during the course of the proffer, the promise not to directly use what she says against her shall be null and void. Not only would your client then no longer be afforded the <u>use immunity</u> as previously set forth herein, but she would also be subjected to prosecution for perjury for any intentional deviation from the truth.

The letter repeats the requirement for defendant's telling the truth:

> Overriding all else, at all times she shall tell the truth and nothing other than the truth during this investigation.

The proffer letter ends by trying to clearly enunciate the limit of the proffer agreement itself:

> At this time the Government is not entering into any plea agreement or negotiations or representing that it will enter into any plea agreement or negotiations. Any plea agreement or negotiations the Government may enter into will be determined after the interview and shall be left to the sole discretion of the United States Government.

The court finds that the proffer letter contains an agreement to engage in negotiations involving specific concessions by the government in exchange for further cooperation if the government believes that the information in the proffer is truthful, candid and meritorious. The letter also provides use immunity subject to the limitations stated earlier. The proffer letter does not say that the pending indictment would be dismissed and not be refiled. In fact, even in the statement of use immunity, a possible later prosecution is specifically anticipated by the words, "any statement made by your client will not be used directly against her in the present or <u>any subsequent prosecution</u>."(emphasis supplied.) That statement is in bold print and is initialed by Mr. Price and by Mr. Hill.

In the acceptance of the letter signed by Ms. Hyles and Mr. Hill, the defendant states that she fully understands that "There are no promises by the Government to enter into any agreement."

The whole proffer letter is attached to this Report and Recommendation as Addendum 1.

The defendant acknowledges in her Memorandum (Document #54) that in the proffer letter there was no agreement regarding disposition of the charges against the defendant, though it was contemplated that there may be a discussion of disposition in exchange for further cooperation. Id. at 4.

The defendant alleges that there was a second agreement, that the terms of the agreement "were that in exchange for the statements that [the defendant had] made up to the time immediately prior to the dismissal and for her expected future response to their questions, that the charges would be dismissed against her."

There was a dismissal of the first indictment against the defendant on October 24, 2001. There is no record that a hearing took place in connection with the dismissal. The court asked the parties to obtain any record of a hearing concerning the dismissal, and the parties reported that they did not find a record.

In her Memorandum, the defendant states that the attorney for the government has refused to acknowledge that there was a second agreement in addition to the actual proffer agreement. The defendant points to the testimony of Agent Larry Bruns of the FBI at the second hearing on the defendant's motions, at which Agent Bruns was called to testify by Mr. Hill, the defendant's attorney. Mr. Hill asked and Agent Bruns answered as follows:

Q        So to your knowledge, were the charges dismissed because of the negotiations between the Government and myself?

A        Yes. What those details were, I do not know, but yes.

(Tr. II-12).

In the testimony leading up to the just-above-quoted question and answer, Agent Bruns testified that he was somewhat involved or aware of discussions between the counsel for the government and defendant's attorney regarding a disposition of the charges against Ms. Hyles.

- 6 -

Agent Bruns was asked if it was his understanding, to the extent that he knew, that the charges against Ms. Hyles were dismissed because of her past cooperation and the expectation that she would continue to cooperate. Agent Bruns responded, "Not solely, no." (Tr. II-12). Agent Bruns stated there was another factor that resulted in the dismissal other than negotiations. Agent Bruns responded:

> Yes, the fact that the trial date on Ms. Hyles was approaching, was quite near, and we had the issue of pursuing charges against Mr. Cannon and Mr. Hyles, and those were the primary focus of the investigation of the prosecution, so we wanted to pursue that first, and then consider Ms. Hyles at a later time.

Id.

The trial on the first indictment against Ms. Hyles was scheduled for October 29, 2001, five days after the indictment was dismissed.

Agent Bruns had testified at the first hearing on defendant's pretrial motions about the dismissal of the first indictment against Ms. Hyles as follows: "We knew she had been lying. I think at that point, myself and Mr. Price felt like she still was not giving us everything she knew. The indictment was not dismissed because we thought she was telling the truth and telling us everything that she knew about it. That's certainly not the reason for the dismissal of the indictment." (Tr. I-96-97). Agent Bruns was then asked if the indictment was dismissed "because she was a useful witness." He answered, "She was a useful witness. We were continuing to pursue her cooperation. The trial was five days away, so we really – you know, our focus was certainly on Mr. Cannon and Mr. Hyles. Agent Bruns was then asked, "She stopped being a useful witness on February 8th of 2005, true?" He replied, "That's correct." Id.

The court does not find any evidence that there was an agreement that the defendant would not be recharged.

Even if one were to accept the premise of defendant's attorney in his examination of Agent Bruns during the second hearing, that the charges against Ms. Hyles were dismissed because of her past cooperation and the expectation that she would continue to cooperate (Tr. II-11-12), the fact remains that Ms. Hyles had not given complete cooperation in the past, not was her cooperation what was required by the proffer letter after the dismissal of the first indictment against her. The defendant argues for an "implicit" agreement that a second indictment would not be filed. It is quite clear that the indictment was dismissed without prejudice and, as indicated earlier in this Report and Recommendation, the proffer letter itself contemplated a possible later prosecution besides the original indictment against Ms. Hyles.

Defendant's attorney, at the first hearing, did not take the position that the defendant had been consistent in her interviews with government officials when, in the cross-examination of Agent Bruns, he asked, "You would agree with me that her [Tonya Hyles's] statements changed from June 11 all the way through at least her testimony at the grand jury, is that true?", to which Agent Bruns replied, "Yes, in more than one way, yes."

The court finds the following inconsistencies and changes in the information given by Ms. Hyles:

## I. Statement Made at October 15, 2001 Proffer Discussion

- On October 15, 2001, Ms. Hyles stated that Tyrese Hyles bought a 1984 Pontiac Parisienne for the purpose of giving it to Amesheo Cannon and that he instructed her to give the car to Cannon. (Testimony of Special Agent Larry Bruns at I-61)[2]. This conflicted with the

---

[2]The testimony of Agent Bruns is cited extensively concerning contradictions in Ms. Hyles's testimony extending over many months. Ms. Hyles did not in her testimony deny that Agent Bruns testified accurately. She attempted to limit her testimony to the meeting on February 8, 2005, just prior to the trial of Amesheo Cannon. She invoked the Fifth Amendment when asked about earlier meetings on cross-examination. Thus, the record does not reflect in the main any differences she had

statement she gave at a June 11, 2001 proffer discussion, that Tyrese instructed her sometime in October 2000 to give the car to Cannon so that Cannon could sell the car but he later said that he was just testing her and that he did not really want her to do that. (Id. at I-57).

## II. Statements Made During Testimony Before Grand Jury on October 18, 2001

- Ms. Hyles testified before the Grand Jury that Tyrese Hyles did not tell her why he wanted her to bond David Carter out of jail until after she had done so. (Grand Jury Transcript at 177; Testimony of Agent Bruns at I-120). The Government later discovered through other sources that Ms. Hyles knew that the purpose of bailing Carter out of jail was to kill Coy Smith. (Testimony of Agent Bruns at I-80).

- Ms. Hyles testified before the Grand Jury that when she contacted Samuel Anderson to obtain a gun, she did not tell him what it was for. (Grand Jury Transcript at 184; Testimony of Agent Bruns at I-66). This conflicted with her statement given during a proffer discussion on June 11, 2001, that she told Anderson the purpose of the gun was to give to David Carter to use to kill Coy Smith. (Testimony of Agent Bruns at I-55, I-66, I-120).

- Ms. Hyles testified before the Grand Jury that she and Hendrietta Nichols traveled to Memphis to bring Amesheo Cannon to Caruthersville in February or March of 2000. In previous statements, Ms. Hyles had denied going to Memphis. (Grand Jury Transcript at 180-81; Testimony of Agent Bruns at I-63-64). On June 11, 2001, Ms. Hyles stated only that she saw Cannon around Caruthersville days after Carter received the gun, and failed to disclose that she picked Cannon up from Memphis. (Testimony of Agent Bruns at I-57). During a June 14, 2001 proffer discussion, Ms. Hyles stated that Nichols stayed at her apartment for at least a month and a half beginning in July of 2000. Ms. Hyles stated that

with the testimony of Agent Bruns and Sergeant Lockett.

- 9 -

Nichols was seeing Cannon at that time and that Cannon had been calling the apartment to talk to Nichols. Ms. Hyles, however, did not disclose at this time either that she had traveled to Memphis with Nichols to bring Cannon to Caruthersville days before the murder. (Id. at I-59).

- Ms. Hyles testified before the Grand Jury that Tyrese told her in October 2000 to give the car to Amesheo Cannon so Cannon could sell it to someone in Jefferson City. (Grand Jury Transcript at I-185-86; Testimony of Agent Bruns at I-67). This conflicted with the statements she had given on June 11, 2001 and on October 15, 2001 regarding the purpose of the purchase of the car, as described above.

## III. Statements Made on December 19, 2001, When Ms. Hyles Was Scheduled to Take a Polygraph Examination

- On December 19, 2001, Ms. Hyles stated that when Samuel Anderson delivered the gun to her apartment, she took it and put it in a cabinet. (Testimony of Agent Bruns at I-76). This conflicted with her statements given on June 11, 2001, and on August 7, 2001, that she did not want to touch the gun and told Anderson to place the gun on the couch, where David Carter later retrieved it. (Id. at I-55, I-60).

- On December 19, 2001, Ms. Hyles stated that she traveled with Hendrietta Nichols to Memphis on August 15, 2000, to pick up Cannon and bring him to Caruthersville. (Testimony of Agent Bruns at I-75). This conflicted with her October 18, 2001 Grand Jury testimony that she traveled to Memphis to bring Cannon to Caruthersville in February or March of 2000. (Id. at I-63-64). Prior to her Grand Jury testimony, Ms. Hyles denied going to Memphis at all.

- On December 19, 2001, Ms. Hyles testified for the first time that she knew the car was payment for the murder. (Testimony of Agent Bruns at I-76). She also stated at this time

- 10 -

that David Carter told her when he was bonded out that Tyrese said Carter could have the car if he killed Coy Smith, a fact that was not disclosed in past statements. (Id. at I-76).

## IV. Statements Made at February 8, 2005 Meeting at the U.S. Attorney's Office in St. Louis

- On February 8, 2005, Ms. Hyles stated that she did not know who Amesheo Cannon was referring to when he stated "I'm going to kill that nigger," while driving past Coy Smith's home. This conflicted with her statement given during a proffer discussion on June 14, 2001, at which time she indicated that Cannon was referring to Coy Smith. (Testimony of Det. Lockett, at I-28-30, I-34-35, I-83; Testimony of Agent Bruns at I-59)[3].

- On February 8, 2005, Ms. Hyles stated that David Carter told her that he did not intend to kill Coy Smith but, rather, he was just "playing" Tyrese. This conflicted with her June 11, 2001 statement that she asked Carter if he was really going to kill Smith and Carter answered that he was, and that he had killed someone before. (Testimony of Det. Lockett at I-31, I-33-34; Testimony of Agent Bruns at I-56, I-83).

- On February 8, 2005, Ms. Hyles stated that she had not received any messages from or otherwise communicated with Tyrese or his associates. Conversations between Devon

---

[3]As a review of the testimony and pleadings reveals, an important question was to whom Amesheo Cannon was referring when he made the comment about killing "that nigger." In her testimony at the second hearing on defendant's pretrial motions, Ms. Hyles revealed a lack of candor with the Assistant United States Attorney at the interview on February 8, 2005 (II-21):

Q. Okay. Did you have an opinion as to who Amesheo Cannon meant when he said that?
A. Yes.
Q. Okay. Did they ask you for your opinion?
A. Not – yes, he did.
Q. He asked you what your opinion was?
A. Yes.
Q. What was your response to that question?
A. I told him I didn't know.

- 11 -

"Gator" Johnson and Tyrese proved this to be untrue. (Testimony of Agent Bruns at I-82). The Government discovered through audio tapes between Tyrese and Gator that Tyrese communicated to Ms. Hyles through Gator. Specifically, Tyrese directed Ms. Hyles not to "do anything crazy." (Id. at I-78). On another occasion, Gator informed Tyrese of a conversation he had had with Ms. Hyles regarding the car. (Id.). In addition, Tyrese instructed Gator to find out from Ms. Hyles who was bringing drugs to the jail. (Id.). It was also discovered that Tyrese and Gator knew Ms. Hyles came to St. Louis in February 8, 2005 to talk to the Government. (Id. at I-78-79).

- The Government discovered through an inmate incarcerated with Tyrese Hyles that Tyrese ordered Ms. Hyles to give the car to Cannon earlier than Ms. Hyles had previously disclosed. (Testimony of Agent Bruns at I-79). Ms. Hyles did not reveal this information on February 8, 2005, nor on any other occasion. (Id. at I-83).

- The Government discovered prior to the February 8, 2005 meeting that Amesheo Cannon stayed at the apartment of Ms. Hyles the week before the murder, a fact that Ms. Hyles had not disclosed. (Testimony of Agent Bruns at I-80). On February 8, 2005, Ms. Hyles did not disclose this information. (Id. at I-83).

- The Government discovered prior to the February 8, 2005 meeting that Ms. Hyles told the bondsman when bailing David Carter out of jail that she had just sold the car to Carter, a fact that she had not previously disclosed. (Testimony of Agent Bruns at I-81). Ms. Hyles did not disclose this information on February 8, 2005. (Id. at I-83).

- In addition to the inconsistences described above, Detective Lockett testified that Ms. Hyles was generally evasive in answering questions on February 8, 2005. For example, she

responded "I don't know" or "I don't remember" to many questions that she had answered in the past. (Testimony of Det. Lockett, at I-28-30).

The government has set out inconsistencies and contradictions in the information given by Ms. Hyles in its Response to Defendant's Motions to Suppress Evidence and Statements and for Specific Performance (Document #32 at 24, 25). The government, in its Response to Defendant's Memorandum in Support of Motion for Specific Performance (Document #58 at 5-13), sets out in detail inconsistencies and contradictions by Ms. Hyles.

The defendant makes the claim:

> However none of the purported inconsistencies shows any statements which the government now contends to be untruthful or made by the defendant after the agreement that the defendant seeks to enforce, i.e., the agreement entered between the parties on or about October 24, 2001.

(Defendant's Memorandum, Document #54 at 8).

If one considers either the inconsistencies found by the court earlier in this Report and Recommendation or those found by the government, there are many inconsistencies after October 24, 2001.

The point is that there are many inconsistencies and changes in the defendant's statements throughout the investigation, such that the defendant could not be used as a witness in the trials of Amesheo Cannon and Tyrese Hyles.

The court has some trouble reconciling the argument made on page 8 of defendant's memorandum (Document #54), that none of the inconsistencies were made after October 24, 2001, as grounds to require the dismissal of the second indictment against Ms. Hyles, with the earlier statement in the same memorandum at pages 1 and 2, that the agreement claimed by the defendant that the indictment charging her with crimes arising out of the murder for hire committed by Tyrese

- 13 -

Hyles and Amesheo Cannon would be dismissed in exchange for her statements to government agents prior to that agreement and with the expectation that she would continue to answer questions put to her by the government. The two statements can only be reconciled if it made no difference whether defendant gave true and complete statements or not. That would mean even if the defendant failed to give truthful statements, the government, in the defendant's position, would still not refile an indictment against Ms. Hyles. This rationale even contradicts the agreement in the proffer letter.

The court finds no evidence to support the defendant's contention that there was an agreement that a second indictment would not be filed against Ms. Hyles. The evidence is to the contrary. The court finds the defendant has not fulfilled her commitment as set out in the proffer letter that she would first, reveal everything she knew about the criminal activities of herself, her co-defendants, Amesheo Cannon and Tyrese Hyles, and any others and to do so completely, truthfully and without guile. The defendant had agreed to not provide untruthful information and not withhold the full truth from government agents, telling the truth and nothing other than the truth during the investigation.

At the second hearing on the pretrial motions of the defendant, the defendant did not testify that at many of the meetings with government officials she told the truth. She instead invoked her Fifth Amendment right not to answer the questions which she thought might incriminate her. In so doing, she did not provide support to the contention offered on her behalf, at one point in the hearings, that she had been completely truthful and cooperative.

The government, after the second hearing on the defendant's pretrial motions, filed its Motion to Strike Defendant's Testimony (Document #51). The court denied that motion by an Order (Document #53). The government has filed Government's Motion for Reconsideration of, and Objections to, Order Denying Government's Motion to Strike Defendant's Testimony (Document

#55). Even reconsidering, the court overrules the government's objections to its prior order and denies Government's Motion to Strike Defendant's Testimony for reasons set out in its Order of December 13, 2005 (Document #53).

**IT IS, THEREFORE, RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Document #26) be denied.

**IT IS FURTHER RECOMMENDED** that Defendant's Motion for Specific Performance calling for the dismissal of the pending indictment against Tonya Johnson Hyles (Document #27) be denied.

**IT IS HEREBY ORDERED** that Defendant's Motion to Disqualify the United States Attorney for the Eastern District of Missouri (Document #39) be denied as moot.

**IT IS FURTHER ORDERED** that, at the defendant's request, her Motion for Sanctions (Document #40) be withdrawn.

**IT IS FINALLY ORDERED** that the Government's Motion for Reconsideration of, and Objections to, Order Denying Government's Motion to Strike Defendant's Testimony (Document #55) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/ Lewis M. Blanton
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of February, 2006.



U.S. Department of Justice

*United States Attorney*
*Eastern District of Missouri*

325 Broadway, Second Floor
P.O. Box 2107
Cape Girardeau, Missouri 63702-2107

573-334-3736
FAX / 573-335-2393

June 11, 2001

Matthew Hill
Attorney at Law
P.O. Box 1041
Cape Girardeau, Missouri 63702-1041

**Re: United States v. Tonya Johnson Hyles**

Dear Mr. Hill:

It is my understanding that Tonya Johnson Hyles wishes to explore the possibility of cooperating with the U.S. Government. It is also my understanding that your client is willing to meet with federal law enforcement agents and/or Assistant United States Attorneys and provide truthful information concerning criminal matters of which she may have knowledge that relates to the Complaint filed June 5, 2001, in the Southeastern Division, Eastern District of Missouri, and more specifically with respect to any and all individuals involved in the murder of Coy Smith, Sr. in Caruthersville, Missouri on August 21, 2000.

Before the Government comes to an agreement with Tonya Johnson Hyles, she must submit to an interview with law enforcement officers and/or Assistant United States Attorneys for the purpose of assessing the credibility and value of the assistance, evidence and possible testimony that she can provide. Only if the Government determines that your client's information and ability to develop information is honest, reliable and worthwhile, will the Government enter into any agreement.

This letter is to confirm the Government's position as to the interview to be scheduled with officers of the Federal Bureau of Investigation on or about Monday, June 11, 2001 at 11:00 a.m., or on such date as may hereafter be determined by agreement.

**ADDENDUM 1**



June 11, 2001

For the purpose of allowing the prosecution to assess the credibility and value of the evidence and possible testimony that your client says she can provide, she must agree to first reveal everything she knows about the criminal activities of her, the co-defendants and others in the Eastern District of Missouri and elsewhere, and to do so completely, truthfully, and without guile. This interview and statement by your client will hereinafter be referred to as a "proffer."

In the event that the information contained in your client's proffer is deemed by this office to be truthful, candid, and meritorious, this office will engage in negotiations involving specific concessions which will be made on behalf of the Government in exchange for your client's further cooperation.

With respect to and in exchange for your client's proffer, the only promises made on behalf of the Government in consideration for the proffer are as follows:

(1) Unless otherwise provided herein, any statement made by your client will not be used directly against her in the present or any subsequent prosecution, ~~unless such statement relates to the commission by your client of an offense which involves physical injury to one or more persons.~~

6/11/0 [handwritten]
MBB [handwritten initials]
no [handwritten]

(2) Pursuant to Section 1B1.8 of the Sentencing guidelines, no self-incriminating information given by your client will be used, directly or indirectly, to enhance the Offense Level against your client except as provided in that section. However, the Government may use any statements made or other information provided by your client to rebut evidence or arguments at sentencing materially different from any statements made or other information provided by your client.

**It is understood and agreed, subject to the provisions of paragraph (2) above, that the Government may make derivative use and may pursue any investigative leads suggested by any statements made by or other information provided by your client in the proffer. This provision is necessary in order to eliminate the necessity for a <u>Kastigar</u> hearing at which the Government would have to prove that the evidence it would introduce at trial was not tainted by any statements made by or other information provided by your client during the proffer.**

In the event Tonya Johnson Hyles becomes a witness at any future trials and offers testimony materially different from any statements made or other information provided, the attorney for the Government may cross-examine her concerning any statements made or other information provided. This provision is necessary in order to assure that she does not abuse this opportunity, does not make materially false statements to a Government agency and does not commit perjury when testifying at any future trials. Further, the Government must assure that no court or jury is misled by receiving information materially different from that previously provided by your client.

Further, if your client knowingly provides untruthful information or if she knowingly withholds the full truth from Government agents and/or Assistant United States Attorneys during

June 11, 2001

the course of the proffer, the promise not to directly use what she says against her shall be null and void. Not only would your client then no longer be afforded the <u>use immunity</u> as previously set forth herein, but she would also be subjected to prosecution for perjury for any intentional deviation from the truth.

She must neither attempt to protect any person or entity through false information or omission, nor falsely implicate any person or entity.

Overriding all else, at all times she shall tell the truth and nothing other than the truth during this investigation.

At this time the Government is not entering into any plea agreement or negotiations or representing that it will enter into any plea agreement or negotiations. Any plea agreement or negotiations the Government may enter into will be determined after the interview and shall be left to the sole discretion of the United States Government.

       Sincerely,

       RAYMOND W. GRUENDER
       United States Attorney

       Michael A. Price
       Assistant United States Attorney

MAP:ck
Enclosure

June 11, 2001

ACCEPTED:

    I, TONYA JOHNSON HYLES, have read this letter, consisting of four pages, conferred with my attorney regarding the letter and fully understand that there are no promises by the Government to enter into any agreement.

_____    6-11-01
Tonya Johnson Hyles                  Date
Defendant

_____    6-11-01
Matthew Hill                            Date
Attorney for Defendant
Tonya Johnson Hyles